IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ARBAY LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Civil Action No. 2:03-cv-1473 |
| v. | ) |
| | ) |
| DUQUESNE LIGHT HOLDINGS, INC., | ) Judge Thomas M. Hardiman |
| et al., | ) |
| | ) |
| Defendants. | ) |

**OPINION**

I.   **Introduction**

This case arises out of the purchase and sale of landfill gas interests. Plaintiff Arbay LLC (Arbay) is an Isle of Man company that was created to acquire the gas interests at issue and transfer them to Defendants, which sought to take advantage of substantial tax benefits pursuant to §351 of the Internal Revenue Code. The tax benefits were denied by the Internal Revenue Service and the landfill gas sites are inoperative.

Arbay was a nominal party to the transaction and remains so in this case, having assigned its rights to Diversified Group, Inc. (Diversified). The Defendants -- Duquesne Light Holdings, Inc., formerly known as DQE, Inc. (DLH), Duquesne Light Company (DLC), and Envirogas Holdings, Inc., formerly known as Envirogas Recovery, Inc. (Envirogas) -- are related companies.

A two day bench trial was held on August 1-2, 2005. The gravamen of Arbay's claim is that Defendants DLH and DLC breached their promises to redeem $1,000,000 in Envirogas preferred stock and to pay Arbay 6% dividends thereon for 20 years.

II.   **Facts**

   *A.   The Arbay-Envirogas Transaction*

The transaction that precipitated this case (Transaction) was conceived by Edward Wallace of Florin Financial (Florin). Wallace and Florin had experience with tax-driven corporate deals and had facilitated five §351 transactions with DLH subsidiaries other than Envirogas. Diversified and its principal, James Haber, had experience with similar transactions. Arbay facilitated the acquisition of the landfill gas interests by borrowing 500,000,000 Dutch guilders (worth approximately $250,000,000) from Rabobank (Loan).

The Loan was secured by a collateral account which held the majority of the proceeds of the Loan and the landfill gas interests. Thereafter, Arbay contributed all of its holdings in the landfill gas interests to Envirogas in exchange for: (1) $20,000,000 in cash; (2) Envirogas' assumption of Arbay's outstanding payment obligations to the developer of the landfill gas sites; (3) $1,000,000 of Envirogas preferred stock (Preferred Stock); and (4) an assumption agreement in which Envirogas became co-obligor on the Loan. Arbay's actual compensation for the Transaction was only $750,000 because the $20,000,000 in cash and $1,000,000 in Preferred Stock were paid to Diversified and Florin. As part of the Transaction, Monongahela Light & Power (ML&P) was required to guarantee the obligations of its subsidiary Envirogas and to agree further to retain sole ownership of another DQE subsidiary, Diemen Flevo, which would continue to hold DLH bonds worth $60,000,000.

On November 3, 1997, Arbay, Envirogas and ML&P entered into a Subscription and Contribution Agreement (Subscription Agreement). The Subscription Agreement is an integrated contract that served as the operative document for the Transaction. All parties hoped that the Transaction would satisfy the requirements of §351 of the Internal Revenue Code, which

involves an asset for stock exchange and is intended to defer the recognition of gain or loss on the transferred property by importing the transferor's basis in the property to the transferee, requiring gain or loss to be recognized only when the property is sold. Thus, Defendants sought to acquire a "stepped-up basis" in the transferred assets that included the amount of the Loan. In addition, certain tax credits were available under §29 of the Internal Revenue Code for gas produced from landfills, although they were worth substantially less than the tax benefits to be derived from the stepped-up basis. In order to qualify the Transaction under §351, it was necessary to issue preferred stock that met certain criteria.

Schedule A to the Subscription Agreement sets forth the terms of the Preferred Stock that was issued to Arbay, which provides that dividends are to be paid " . . . when and if declared by the Board of Directors . . . ." In addition, Envirogas may redeem the stock after the twenty-first anniversary of its issuance.

B.   *The Parties and Their Discussions Regarding the Transaction*

Although Arbay is the named Plaintiff in the case, Diversified is the real party in interest. Diversified is a trust for the benefit of the children of its President, James Haber, who, along with Arbay's counsel, Robert Unger, had substantial involvement in the Transaction. By agreement, Diversified contracted to act on Arbay's behalf on all United States matters and was assigned all of Arbay's interests in the Transaction. Accordingly, any recovery in this lawsuit belongs to Diversified.

Defendants DLH and DLC are Pennsylvania corporations, while Defendant Envirogas is a Delaware corporation. Envirogas is a subsidiary of DQE Financial, formerly known as Montauk, Inc., and is the successor in interest to Envirogas Recovery, Inc.

Christine Hovan Flynn (Flynn), who was an employee of DLC and President of Envirogas from the time of its formation in 1997, managed the execution process of various transactions for DLC. She interacted with personnel of the companies with whom DLC contracted and ensured that all of the necessary approvals were obtained. Flynn had neither the authority nor the responsibility for negotiating the terms of the Arbay Transaction. Instead, she prepared presentations to explain and present the Transaction to senior management for approval. Flynn interacted with Diversified and Haber to gain an understanding of the structure of the Transaction so she could communicate effectively with senior management. She also interacted with Robert Unger, who was counsel to Arbay and viewed Flynn as a "high-up executive" with DLC, but he had no details regarding Flynn's role or authority.

In early 1997, based on its experience with Florin, DLH decided to pursue the §351 Transaction utilizing assets which were also eligible for tax credits under §29 of the Internal Revenue Code. The purpose of the Transaction was to help DLH and DLC meet their tax planning objectives, and to provide a creative financing mechanism to enable DLC to meet its earnings objectives and support its stranded cost recovery plan. Accordingly, Ed Wallace of Florin introduced Arbay/Diversified to DLH/DLC and negotiations ensued.

In April 1997, Florin and Diversified prepared a document that described the Transaction and indicated that an unnamed DLH or DLC subsidiary would issue preferred stock with dividend payments and redemption after 20 years. Although the amount of the stock changed and the redemption period was increased to 21 years, the basic elements of the deal as described in the initial document prepared by Florin and Diversified remained the same.

As with previous §351 transactions Florin facilitated for DLH, the initial presentation was made to DLH Treasurer Donald Clayton (Clayton) and others in the DLH/DLC Treasury

4

Department, including Christine Hovan Flynn. Throughout the negotiations, Haber and others dealt with Flynn believing that she spoke for DLH and DLC. According to Haber, during the course of the negotiations Flynn made various unspecified decisions without securing approval from any other individual at DLH or DLC. Moreover, Haber testified that Flynn never told him that she did not have authority to speak for DLH or DLC.

Not surprisingly, Flynn had no actual authority to bind Envirogas, DHL, or DLC to any contracts that differed from the terms of their written agreements. As for written agreements involving Envirogas, Flynn had to receive approval from management and the boards of directors of DLH companies. Although Haber knew that board approval was required to approve the Transaction, he thought Flynn was speaking on behalf of DLH and DLC because no other entity was identified as the potential transferee in their early discussions. Nevertheless, Haber testified equivocally regarding whether he was told that Flynn could speak on behalf of DLH or DLC. At trial, he testified that Don Clayton told him "by his actions in that [Flynn] continually acted as the point person for the transaction . . . ." At the same time, however, Haber acknowledged that neither Don Clayton nor another representative of DLH or DLC actually told him that Flynn was the person to deal with on the Transaction. Instead, Haber merely inferred that Flynn had authority to speak for DLH or DLC based on the natural evolution of the Transaction.

During the initial stages of the negotiations, the parties did not focus on which DLH subsidiary would be used to consummate the Transaction with Arbay. At some point, DLH subsidiary Diemen Flevo was considered. That later changed, however, and as of September 19, 1997, Envirogas was identified as a party to the Transaction.

Virtually all of Haber's discussions with Flynn regarding the Transaction were telephonic and he did not differentiate among any of the DLH entities in his discussions with her. Furthermore, Haber's testimony regarding alleged oral agreements was vague at best. First, he testified that the only difference between the written terms set forth in Schedule A to the Subscription Agreement and the alleged oral agreement was that the stock was to be redeemed after the tax issues were resolved and "DQE stood behind the terms." He later testified that another difference between the written terms of the Preferred Stock and the alleged oral agreement was that DQE would pay the dividends when Envirogas did not. Haber also testified that he referred "generically" to both the utility (DLC) and the public company (DLH) as DQE.

Haber's claim that he referred to both DLC and DLH to denote DQE – and that Flynn entered into the alleged oral agreement on behalf of both DLC and DLH – is undermined by the fact that DLC was not named as a defendant in the original lawsuit. Moreover, although Haber testified that an oral agreement regarding the mandatory early redemption of the stock was reached during a single telephone call with Flynn, he could not provide even a month in which that alleged oral agreement was reached. Nor did Haber testify as to the approximate date of the second oral agreement, when DLC and DLH allegedly guaranteed payment of the dividends. Haber testified at trial that the second alleged oral agreement was reached "in the final moments" or "at the last minute" of the Transaction, when Envirogas was substituted for Diemen Flevo. Haber also testified that the oral agreement was reached after all the written terms of the Preferred Stock had been agreed upon, including the discretionary nature of the redemption. Haber testified: " . . . everything was in place relative to the preferred stock except for the issuer."

Contrary to Haber's testimony, almost two months before the closing, on September 19, 1997, Envirogas was identified as the party to the Subscription Agreement. Furthermore, as of October 17, 1997, the discretionary redemption of the preferred stock had not yet been agreed upon. Therefore, Haber's claim regarding the timing of the alleged oral promises that DLH and DLC would guarantee to redeem the Preferred Stock and pay dividends is contrary to the record.

Also significant is the fact that the September 19, 1997 memo that Haber prepared and described as a "summary of the new terms" of the Transaction is devoid of any reference to a guarantee of dividends or redemption of the Preferred Stock. When DLH substituted Envirogas for Diemen Flevo, which required significantly less capital to satisfy the requirements of §351 because of Envirogas' insubstantial net worth, Haber was aware that DLH was "trading down" and he expressed concern about this development. Nevertheless, Haber did not seek any changes to the Subscription Agreement.

Additionally, the terms of the alleged oral agreement to redeem the Preferred Stock in contravention of the written terms of the Subscription Agreement were imprecise. Haber testified that the Preferred Stock was to be redeemed "when the tax transaction got resolved with the Service, whether it was going to be examined or non-examined, the statute of limitations passed, did not pass, when all of those items got resolved." Haber acknowledged that the time for the redemption of the Preferred Stock was not defined by years because it was not to occur until after all tax issues had been resolved and the statute of limitations could be "extended and extended." The Court finds this testimony unpersuasive.

First, Haber testified the stock was to be redeemed "[a]ny time after the stock issues relating to the transaction were resolved." But he later modified this testimony to state that only the issues relating to the stepped-up basis were to be resolved prior to the redemption of the

stock. Second, Haber's testimony regarding his discussions with Arbay concerning the alleged oral agreements was contradictory. He testified at trial that he discussed the arrangements for the payment of the dividends with Arbay's principals. In his deposition, however, Haber stated that he never had such discussions regarding the time or manner of the redemption of the Preferred Stock.

  C. *Defendants' Internal Review and Approval of the Transaction*

Not unlike the original proposal submitted by Florin and Diversified, Flynn summarized the Transaction in a memorandum that included its essential terms. Significantly, Flynn's memorandum does not suggest in any way that DLH or DLC would guarantee to pay dividends or redeem the Preferred Stock, which are material terms she would have included as a matter of course in such a memorandum.

On October 17, 1997, the Envirogas Board of Directors approved the Transaction on the terms set forth in the Subscription Agreement. Likewise, the sole shareholder of Envirogas, ML&P, approved an amendment to the Articles of Incorporation to allow the Preferred Stock issuance. Specifically, ML&P approved the investment of $23,000,000 in the Transaction, and the acquisition of the Preferred Stock in exchange for $600,000 in cash. None of these corporate approvals reflected in any way the alleged oral agreements that dividend payments or stock redemption were to be made contrary to the written terms of the Preferred Stock or the Subscription Agreement. Nor do they reflect that DLC or DLH were guaranteeing the payments of the dividends or the redemption of the Preferred Stock.

Arbay claims that Flynn promised that DLH and DLC would pay $1,000,000 as soon as any tax issues relating to the Transaction were resolved either favorably or unfavorably, or when

8

the statute of limitations had expired on any possible tax challenges to the Transaction. Arbay correctly notes that Flynn has never expressly testified that she *did not* promise that DLH and DLC would make the annual dividend payments and later pay to redeem the Preferred Stock. Rather, Flynn testified that she *would not* have made representations which were contrary to the terms of Preferred Stock set forth in Schedule A to the Subscription Agreement. The Court finds Flynn's testimony credible and consistent with the absence of an oral contract in derogation of the written documents executed by the parties.

Consistent with Flynn's testimony, the prime mover of the Transaction, Ed Wallace, did not tell Haber that payment of the dividends or redemption of the Preferred Stock were guaranteed. At most, Wallace would have told Haber that he believed that the obligation was a good one. Wallace also testified that there was never any discussion of DLH or DLC guaranteeing dividend payments or the redemption of the Preferred Stock. Although Wallace believed that the dividends should be paid regardless of the failure of the landfill gas projects, this was based on his erroneous assumption that tax benefits were derived or would be derived from the stepped-up basis component of the Transaction. Although Wallace was unaware that the IRS disallowed the tax benefits, he understood that such a disallowance would have resulted in a charge against the earnings of Envirogas pursuant to the tax sharing agreement.

Like Wallace and Flynn, Arbay's counsel Robert Unger acknowledged that the Preferred Stock does not give Arbay a right of redemption. His only testimony regarding the alleged oral agreements was that "Arbay's concerns were addressed by essentially [Flynn] committing that regardless of the subsidiary that was substituted, DQE would continue to stand behind the obligations of Envirogas with respect to the dividends and the ultimate redemption of the Preferred Stock." Unger did not testify that either DLH or DLC guaranteed payment of the

9

dividends or redemption of the Preferred Stock irrespective of its written terms. Nor did he testify there was an oral agreement in contravention of §351 of the Internal Revenue Code. Instead, Unger testified at trial that there were discussions in which Flynn participated "to the effect" that DQE would pay the dividends and redeem the Preferred Stock. At the same time, Unger admitted that Flynn did not tell him anything personally.

Attorney Unger's trial testimony contradicted somewhat his deposition testimony in which he stated that Arbay neither requested nor discussed a DQE guarantee of Envirogas' obligations because it would have been inconsistent with the debt versus equity analysis. In other words, in a §351 transaction, the Preferred Stock must qualify as equity and not debt, or the tax benefits will be lost. Based on his discussions with Envirogas' counsel, Unger knew that the Preferred Stock had to be pure equity, which necessarily meant that neither redemption of the Stock nor payment of the dividends could be mandatory. Unger admitted that if Arbay had the right to require Envirogas, DLH or DLC to redeem the Preferred Stock, the Transaction would not meet the requirements of §351.

As indicated previously, the Transaction was attractive to Defendants because of the substantial stepped-up basis they might achieve. James Haber of Diversified knew that the Preferred Stock had to be qualified under §351 to achieve the intended tax benefit. Haber also acknowledged at trial that the terms of the Preferred Stock were driven "solely" by the requirements of §351, which provides, in relevant part:

NONQUALIFIED PREFERRED STOCK. - For purposes of paragraph (1)---

    (A) IN GENERAL ---- The term "nonqualified preferred stock" means preferred stock if-

        (i) *the holder of such stock has the right to require the issuer or a related person to redeem or purchase the stock,*

10

>              (ii) *the issuer or a related person is required to redeem or purchase the stock,*
>
>              (iii) *the issuer or a related person has the right to redeem or purchase the stock and, as of the issue date, it is more likely than not that such right will be exercised,* or
>
>              (iv) the dividend rate on such stock varies in whole or in part (directly or indirectly) with reference to interest rates, commodity prices, or other similar indices.
>
>       (B) LIMITATIONS -- *Clauses (i), (ii) and (iii) shall apply only if the right or obligation referred to therein may be exercised within the 20-year period beginning on the issue date of such stock and such right or obligation is not subject to a contingency which, as of the issue date, makes remote the likelihood of the redemption or purchase*.

26 U.S.C. §351(g)(2) (emphasis added). Haber understood that if the Preferred Stock permitted Arbay to force a redemption within 20 years, it would not have qualified under §351. Likewise, attorney Unger understood that the Preferred Stock had to have the terms set forth in Schedule A to the Subscription Agreement and could not grant to Envirogas or a related party (*i.e.*, DLH or DLC) the right to redeem the stock for it to be qualified stock pursuant to §351.

>    D.    *Dividend Payments*

From 1998 through 2001, while Envirogas endeavored to produce gas from the landfill sites, Arbay received annual dividend payments of $65,000 (less withholding tax) pursuant to the recommendation of Frosina Cordisco, who was an officer or director of Envirogas. Ms. Cordisco testified credibly that the dividends were paid because of the anticipated tax benefits, despite the fact that Envirogas never had earnings or profits sufficient to pay such dividends. Unlike the 1998, 1999, and 2000 payments that were made by Envirogas, the 2001 dividend payment was made by Montauk Energy Capital because it was managing the landfill gas sites.

11

However, Ms. Cordisco testified that the accounting for that dividend payment would have been reflected in the Envirogas financial statements. Although the annual dividend payments from 1998 through 2001 may have reasonably led Arbay to believe that they would continue into perpetuity regardless of Envirogas' financial condition, Envirogas had no contractual obligation to declare such dividends.

The dividend payments ceased in 2002 because by that time the landfill gas sites were no longer in operation, there were no other sources of income to pay dividends, and the financial condition of Envirogas had deteriorated further. More importantly, by 2002 the IRS was discussing with DLH the disallowance of the tax benefits attributable to the stepped-up basis, which was the reason for the Transaction in the first place.

### III. Analysis

As noted previously, the gravamen of Arbay's claim is that DLH and DLC breached their oral promises to redeem the Preferred Stock and to pay annual dividends thereon. Initially, it should be noted that proof of an oral contract must be clear and precise. *Channel Home Centers v. Grossman,* 795 F.2d 291, 298-99 (3d Cir. 1986); *In re Estate of Billinger*, 301 A.2d 795, 796 (Pa. 1973); *Thompson v. Schoch*, 99 A. 72, 73 (Pa. 1916). A plaintiff must prove the following elements to establish a breach of contract: (1) the existence of a contract including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages. *CoreStates Bank, Nat'l Assn. v. Cutillo*, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999). A plaintiff must prove the existence of an offer, acceptance and mutual consideration, *i.e.,* bargained for exchange. *PennDOT v. First Pennsylvania Bank*, 466 A.2d 753 (Pa. Commw. Ct. 1983). Finally, there

must be a meeting of the minds of the parties regarding the essential elements of their agreement. *Degenhardt v. Dillon Co.*, 669 A.2d 946, 950 (Pa. 1996).

The evidence offered by Arbay to support its claims that oral contracts existed that imposed obligations contrary to the written agreements of the parties was equivocal and vague. Accordingly, it falls well short of the clear and precise evidence standard necessary for proving the existence of an oral contract. Essential to its claim, Arbay argues that Christine Hovan Flynn had apparent authority to enter into the oral contracts with Arbay on behalf of DLH and DLC. Specifically, Arbay claims that Don Clayton, as Treasurer of DLH and DLC, led Arbay to believe that Flynn had the authority to negotiate on behalf of and bind DLH and DLC without receiving management or board approval.

Under Pennsylvania law, apparent authority is that authority which, although not actually granted, the principal knowingly allows the agent to exercise or possess. *See, e.g., Universal Computer Sys., Inc. v. Medical Serv. Ass'n of Pa.*, 628 F.2d 820, 823 (3d Cir. 1980); *McNeil Real Estate Fund XXVI, L.P. v. Matthew's, Inc. of Delaware*, 112 F. Supp.2d 437, 441 (W.D. Pa. 2000). The evidence adduced at trial demonstrated that Flynn had apparent authority to act on behalf of DLH and its subsidiaries during the time the parties were exploring the Transaction.

Once Envirogas was disclosed as the entity that would become the party to the Subscription Agreement, however, no one could reasonably believe that Flynn, who was President of Envirogas, was speaking on behalf of any other entity. This fact is borne out by Haber's testimony in which he expressed concern about the substitution of shell company Envirogas for Diemen Flevo, the substantial entity originally contemplated for the deal. A sophisticated businessman, Haber could have requested additional security or amendments to the written documents to allay his concerns, but he failed to do so.

When parties have reduced their agreement to writing, by law that writing is not only the best, but the only evidence of their agreement. All preliminary negotiations, conversations, and verbal agreements are merged in and superseded by the subsequent written contract, and unless fraud, accident or mistake be averred, the writing constitutes the entire agreement between the parties. *Mellon Bank Corp. v. First Union Real Estate Equity and Mortgage Inv.*, 951 F.2d 1399 (3d Cir. 1991). *See also Knez Optical v. Singer Optical Group*, 1995 WL 649262 (E.D. Pa. 1995).

Because Haber did not differentiate among the DLH entities, any oral agreements he claims to have reached with Flynn were agreements on behalf of not only DLH and DLC, but also Envirogas. The testimony demonstrated that the oral agreements were allegedly made after Envirogas was identified as the entity that would participate in the Transaction. But such oral agreements would have directly contradicted the subsequent written terms of the Preferred Stock in violation of the parol evidence rule. *See Knez Optical, Inc. v. Singer Optical Group, Inc.*, 1995 U.S. Dist. Lexis 16319 (E.D. Pa. 1995) (court dismissed claims against multiple defendants based upon alleged oral representations of officer of one of the parties to a written contract). Even assuming, *arguendo*, that Flynn spoke on behalf of DLC and DLH, she was doing so also as President of Envirogas.

As indicated previously, the Transaction was intended to qualify as a tax-free transfer under §351 of the Internal Revenue Code. Section 351 does not distinguish between written and oral agreements regarding the prerequisites for Preferred Stock to qualify for favorable tax treatment. For purposes of §351, DLC and DLH are parties related to Envirogas. If Arbay had the right to compel Envirogas, DLH or DLC to pay dividends or redeem the Preferred Stock, it would have rendered it non-qualified stock under §351 and the tax benefits the Transaction

14

intended to secure would have been unavailable *ab initio*. Similarly, if Arbay's representatives had entered into a *sub rosa* oral agreement with DLC or DLH to avoid the limitations on the Preferred Stock, they may have been subject to criminal prosecution pursuant to 26 U.S.C. §7201, which provides:

> Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, shall be fined no more than $100,000 ($500,000 in the case of a corporation), or imprisoned not more than 5 years, or both, together with costs of prosecution.

*See, e.g., Development Finance Corp. v. Alpha Housing & Health Care, Inc.*, 54 F.3d 156 (3d Cir. 1995) (illegal contract is void).

In sum, the notion that DLH or DLC promised to pay dividends on and redeem the Preferred Stock is not only contrary to the facts of the case, but contrary to the law as well. Accordingly, judgment will be entered for the Defendants.

An appropriate Order follows.

 

 

_____
Thomas M. Hardiman
United States District Judge

Dated: October 25, 2005